IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| SOFTCHOICE CORPORATION, | ) | |
| | ) | 8:08CV249 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MEMORANDUM AND ORDER |
| BRETT MACKENZIE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This matter is before the court on the defendant's motion for summary judgment, Filing No. 24.  The plaintiff alleges breach of a confidentiality agreement, and asserts tort claims for misappropriation of confidential information and trade secrets, unfair competition, and tortious interference with business contracts and relationships with customers and with Softchoice's former employee, Jeffrey Lawrence.  Jurisdiction is premised on diversity of citizenship.

The plaintiff alleges that its former employee, Brett MacKenzie, breached a confidentiality agreement by sharing confidential information and trade secrets with his present employer and tortiously interfered with its contractual relationships with customers and with another former employee, Jeffrey Lawrence, by inducing Lawrence to breach his nondisclosure and nonsolicitation or noncompete agreement.  The plaintiff also contends that these actions amount to unfair competition.  Softchoice contends that its customer list that has been compiled over time to include "pricing, profit margins, key customer contacts, product mix, customer preferences, and future opportunities" is not publicly available and is protected as a trade secret.  Filing No. 29, Brief at 24.

In his motion for summary judgment, MacKenzie argues that the undisputed facts in this case show he is entitled to judgment on all five of the plaintiff's claims. He first asserts that the doctrine of collateral estoppel bars the plaintiff's claims because a Minnesota state court has determined that the information at issue is not a trade secret in another case involving Softchoice.[1] He next argues that Softchoice cannot prevail on its claims for breach of contract, misappropriation of trade secrets, or unfair competition because the evidence establishes that the information he is alleged to have misappropriated in violation of the contract is not a trade secret. He further argues that his confidentiality agreement with Softchoice is void for lack of consideration and contends he is entitled to judgment on the tortious interference claim because Softchoice had no legitimate expectancy of continuity of business relationships with customers or of its employment relationship with an at-will employee. He argues that neither Lawrence's confidentiality agreement nor covenant not to compete can form the basis of that expectation because the customer information is not secret and the covenant not to compete is overly broad and void under Nebraska law.

## I.  FACTUAL BACKGROUND

The undisputed evidence shows that the defendant, Brett MacKenzie, was employed by Softchoice's predecessor Software Plus, Ltd. ("Software Plus"), a Missouri corporation based in St. Louis, as a sales representative from October 2000 to December 2007. Software Plus was acquired by Softchoice Corporation ("Softchoice") in December

---

[1]See Filing No. 32, Index of Evid., Ex. 10, Order and Memorandum in *Softchoice, Inc. v. Schmidt,* No. 27-CV-08-1354 (Hennepin Co., Minn. Dist. Ct. Apr. 15, 2008), *aff'd on other grounds, Softchoice, Inc. v. Schmidt,* 763 N.W.2d 660 (Minn. App. 2009) at 2 (stating "Softchoice has not shown that there are any trade secrets in this case. . . . This is not a case about "secret sauce." . . . The customer information that the Defendants have is available to anyone in the industry.")

2007.  MacKenzie resigned shortly thereafter.  Software Plus and Softchoice are both

resellers of computer software and hardware and related technology services known as

Large Account Resellers/Enterprise Software Advisors ("LAR/ESA").  They sell software

such as MSWindows, MS Office, Norton Anti-Virus, from manufacturers such as Microsoft

and Symantec to business, governmental agencies and academic institutions.  Filing No.

26, Index of Evid., Ex. 2, Affidavit of Michael Rapp, ("Rapp Aff.") at 1.  The defendant's

present employer, En Pointe Technologies ("En Pointe"), is also an LAR/ESA and

competes with Softchoice.  *Id.*, Ex. 1,  Affidavit of Brian MacKenzie ("MacKenzie Aff.") at 1.

On June 30, 2004, the vice president of Software Plus asked MacKenzie to execute

a Confidentiality and Nondisclosure Agreement.  *Id.,* MacKenzie Aff., Ex. A, Confidentiality

and Nondisclosure Agreement ("MacKenzie Conf. Agr."). The agreement provides that:

> Employee shall not disclose, communicate, divulge, furnish to, or convey to
> any other person or entity any portion of the Confidential Information
> obtained by Employee in connection with this Agreement.  Employee shall
> restrict the custody, possession, knowledge, compilation, preparation and
> use of any and all such Confidential Information to Employee.  Employee
> acknowledges that he/she is subject to and this Agreement is governed by
> the Missouri Uniform Trade Secrets Act.

*Id.* at 3.  The information protected by the Confidentiality Agreement is:

> technical, financial and/or business information pertaining to Company or any
> company owned partially or fully by owners of Company ("Affiliate") which is
> not published or readily available to the public, including, but not limited to,
> any and all Trade Secrets (defined as all information, including but not
> limited to, technical or non-technical data, a formula, pattern, compilation,
> program, device, method, technique, or process, that derives independent
> economic value, actual or potential, from not being generally known to, and
> not being readily ascertainable by proper means by other persons who can
> obtain economic value from its disclosure or use), computer software,
> computer programs, program code, software libraries, databases, bids,
> proposals, plans, projections, strategies, designs, procedures, training
> methods, techniques, know how, methods of operation, marketing concepts
> and plans, manuals, mailing lists, pricing lists and information, sources of
> supplies, and lists of and other information pertaining to and/or received from

customers (including potential customers) and/or supplies and Employee
Work Product described in Section 1(b) hereof ("Confidential Information").

*Id*. at 1.  Information that "becomes available to the Employee from a person or entity who

is not the Company and who is not otherwise bound by a confidentiality agreement with the

Company or affiliate" is expressly excluded from the definition of confidential information.

*Id*. at 2.

Before signing the agreement, the defendant asked for clarification to verify his

understanding that the agreement would not restrict him from contacting his former

customers if he were to leave employment at Software Plus.  *Id.*, MacKenzie Aff. at 3, Ex.

C, email correspondence at 2.  The response included a legal opinion stating that

> [t]he agreement is NOT a noncompete agreement and your employees
> would be able to compete with the company after termination of
> employment. . . .  The only restrictions in this agreement prohibit the use of
> confidential information after employment is terminated. . . .  The employees
> can definitely call on SWP customers after employment terminates so long
> as they do not use confidential information of SWP which could include the
> needs of the customer based upon information of SWP.

*Id.*, email correspondence at 4.  MacKenzie signed the Confidentiality Agreement on July

7, 2004.  *Id.,* Ex. 1, MacKenzie Aff. at 2.  The Confidentiality Agreement provides that

consideration for the agreement was "continued engagement by Company and

compensation paid and/or to be paid by Company to Employee in connection therewith,

and other good and valuable consideration."  *Id.*, MacKenzie Conf. Agr. at 1.

On December 11, 2007, Softchoice completed the acquisition of Software Plus.  *Id.*,

Ex. 1, MacKenzie Aff. at 2.  MacKenzie stated in his affidavit that he was told that his salary

would be reduced by 30%.  *Id.* at 3-4.  On January 2, 2008, MacKenzie resigned from his

employment with Softchoice and began working in a similar capacity for En Pointe

Technologies ("En Pointe") the following day.  *Id.*

4

MacKenzie has submitted evidence that the identity of Softchoice's customers, the relevant contact people for each customer, the customers' needs and product mix, and pricing to individual customers is information generally available to the public and to people within the industry.  Filing No. 26, Index of Evid., Ex. 1, MacKenzie Aff. at 4; Ex. 2, Rapp Aff. at 2-4.   MacKenzie has shown that the information can be obtained through commercially available lists of potential customers, customer Web sites, manufacturers such as Microsoft who supply resellers with information on potential customers, a Web site known as explore.ms, which is available to anyone working for LAR/ESA and provides information relating to customer needs, membership in social networks such as "LinkedIn.com," sources such as Hoovers (a Dun & Bradstreet company), InfoUSA, Leads.com, Iridium information resources, the Omaha Book of Lists, a Web site known as Licensing.microsoft.com, made available to all Microsoft resellers, and from the customers themselves.   *Id.*, Ex. 1, MacKenzie Aff. at 5-7; Ex. 2, Rapp Aff. at 2-3; Filing No. 37, Rebuttal Affidavit of Brett MacKenzie ("MacKenzie Rebuttal Aff.") at 3-4; Filing No. 38, Index of Evid., Ex. E, "www.explore.ms" Web site listing for West Corporation.

The defendant has also shown by affidavit that within the LAR/ESA industry, customers readily and routinely supply information on their IT needs, contracts and pricing information with competitors in order to obtain the best prices for their company.  Filing No. 37, MacKenzie Rebuttal Aff. at 7.  MacKenzie and Softchoice have both produced evidence that MacKenzie obtained pricing information from customers, including Nebraska Furniture Mart, Pinnacle Data, and Sitel, as well as from suppliers such as Symantec.  *See, e.g.*, Filing No. 38, Exs. F & G, email correspondence between MacKenzie and Nebraska Furniture Mart; Exs. H & I, email correspondence between MacKenzie and Sitel Corp.;

Filing No. 30, Index of Evid., Ex. 19, Second Affidavit of Katie Connolly, Ex. J, email correspondence between MacKenzie and Symantec.  In his deposition, Softchoice's Vice President, Douglas Stabenow, acknowledged that customers routinely share pricing information.  Filing No. 55, Supplemental ("Supp.") Index of Evid., Supp. Ex. 9, Deposition of Douglas Stabenow ("Stabenow Dep.") at 108.

Softchoice submitted evidence that it has several compilations of its customer information, but has not refuted the defendant's testimony that he had no access to those compilations and did not retain any "'confidential documents' from Softchoice Plus or Software following [his] termination of employment with Softchoice, in either hard copy or electronic format."  See Filing No. 37, MacKenzie Rebuttal Aff. at 14; Filing No. 55, Supp. Index of Evid., Supp. Ex. 9, Stabenow Dep. at 54-57 (conceding that MacKenzie could not have seen Softchoice's compilations or databases in the short time he worked for Softchoice after it acquired Software Plus).  Stabenow testified that the information was obtained through an endeavor that "can take anywhere from six months to a year, and requires a significant investment by Softchoice in the form of salaries for its sales employees and their marketing and customer promotion efforts."  Filing No. 30, Index of Evid., Ex. 18, Stabenow Aff., at 5-6.  Stabenow testified that Softchoice guards its confidential information through the use of password protected customer databases, firewalls and physical security measures, such as locks that restrict access to hard copy files.  *Id.* at 9.

Softchoice has also submitted evidence showing that En Pointe contracted with several former Softchoice customers.  Filing No. 30, Ex. 18, Stabenow Aff. at 8.  Stabenow acknowledged that sales representatives consult publicly available online sources, but

states there is no publicly available source that compiles all the information in a single place.  *Id.* at 4, 6.  Stabenow also stated that MacKenzie provided a list of sixteen former customers to En Pointe and surmises that "the only way that MacKenzie could have come up with such precise margin information in such a short period of time was if it was based on his knowledge of what Softchoice had for those same customers."  *Id.*  at 9-10.

Jeffrey Lawrence was also employed by Software Plus, and then by Softchoice.  In 2006, while employed by Software Plus, Lawrence signed a confidentiality and noncompetition agreement.  Filing No. 31, Index of Evid., Ex. 2, First Affidavit of Katie Connolly, Ex. C, Confidentiality and Non-Compete Agreement ("Lawrence Agreement"). In the agreement, Lawrence agreed that "while employed by and for a period of two (2) years following termination of said employment," he would not "undertake or attempt . . . to market, offer or provide products or services substantially similar to those marketed, offered or provided by [Software Plus], to any person or entity who has received such services from [Software Plus] or who has been solicited by you and/or [Software Plus] at any time during the Nonsolicitation Period whether or not you were involved in providing such products or services or involved in soliciting such person or entity."  *Id.* at 1-2.

## II.  Discussion

### A.  Law

On a motion for summary judgment, the question before the court is whether the record, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005).  "Where unresolved issues are primarily legal rather than factual,

7

summary judgment is particularly appropriate." *Mansker v. TMG Life Ins. Co.*, 54 F.3d 1322, 1326 (8th Cir. 1995)*.

The burden of establishing the nonexistence of any genuine issue of material fact is on the moving party.  Fed. R. Civ. P. 56(c); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Once the defendant meets its initial burden of showing there is no genuine issue of material fact, the plaintiff may not rest upon the allegations of his or her pleadings but rather must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists.  *See* Fed. R. Civ. P. 56(e)(2); *Chism v. W.R. Grace & Co.*, 158 F.3d 988, 990 (8th Cir. 1998).  The party opposing the motion must do more than simply show that there is some metaphysical doubt as to the material facts; he or she must show there is sufficient evidence to support a jury verdict in his or her favor.  *Id.*  "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "In ruling on a motion for summary judgment, a court must not weigh evidence or make credibility determinations."  *Kenney v. Swift Transp., Inc.*, 347 F.3d 1041, 1044 (8th Cir. 2003).

In diversity cases, the choice of law is governed by the forum state's choice-of-law rules.   *See* *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *In re Derailment Cases*, 416 F.3d 787, 794 (8th Cir. 2005).  Nebraska follows the Restatement (Second) of Conflicts of Laws.  *DCS Sanitation Mgmt., Inc. v. Casillo*, 435 F.3d 892, 895 (8th Cir. 2006); *Inacom Corp. v. Sears, Roebuck & Co.*, 254 F.3d 683, 687 (8th Cir. 2001).  With respect to contracts, "Nebraska courts generally give effect to the parties' choice of

law." *DCS Sanitation Mgmt.*, 435 F.3d at 896 (stating that "[t]he parties' contractual choice of law will apply unless (1) 'the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice,' or (2) 'application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which . . . would be the state of the applicable law in the absence of an effective choice of law by the parties.'" *Id.* (quoting Restatement § 187(2)(a) (b)). However, notwithstanding a choice of law provision, Nebraska law is applied to the question of the validity and enforceability of noncompete agreements. *DCS Sanitation Mgmt.*, 435 F.3d at 897 (8th Cir. 2006); *First Nat'l Bank v. Daggett*, 497 N.W.2d 358, 363 (Neb. 1993) (disregarding choice-of-law provision because the chosen state had no contacts with the transaction and the parties, and application of the chosen state's law would offend a strong public policy in the forum state); *see also Rain & Hail Ins. Serv., Inc. v. Casper*, 902 F.2d 699, 700-01 (8th Cir.1990) (applying Nebraska law to a noncompete clause where parties had agreed to Iowa law, stating "Iowa law would be contrary to a fundamental policy of Nebraska").

With respect to tort claims, the rights and liabilities of the parties are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties. *Inacom Corp.*, 254 F.3d at 688 (applying Restatement (Second) of Conflict of Laws § 145). When the relevant legal principles are the same in both states, "what has come to be called a false conflict " is presented and the court need not resolve the choice of law issue. *See A.P. Leonards v. Southern Farm Bureau Cas. Ins. Co.*, 279 F.3d 611, 612 (8th Cir. 2002). Collateral estoppel is an issue

of substantive law requiring the application of state law in diversity actions. *Jaramillo v. Burkhart,* 999 F.2d 1241, 1243 (8th Cir. 1993).

The applicability of collateral estoppel is a question of law. *Eicher v. Mid America Fin. Invest. Corp.*, 270 Neb. 370, 702 N.W.2d 792 (2005). Collateral estoppel means that when an issue of ultimate fact has been determined by a final judgment, that issue cannot again be litigated between the same parties in a future lawsuit. *Woodward v. Andersen,* 261 Neb. 980, 627 N.W.2d 742 (2001). "Collateral estoppel, like the related doctrine of res judicata, has the dual purpose of protecting litigants from the burden of relitigating <u>an identical issue</u> with the same party or his privy and of promoting judicial economy by preventing needless litigation." *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 326 (1979) (citations omitted, emphasis added). Unlike res judicata, however, collateral estoppel will in some cases bar relitigation of a particular issue even where both disputing parties were not bound by the earlier judgment. *Id.* at 327-28, 331. This added potential for binding effect operates fairly only because collateral estoppel requires that the issue have been fairly and fully litigated in the first suit, and that it be necessarily decided by that suit's outcome. *Id.* at 327. An issue is identical "in the absence of a significant factual change." *Kopecky v. National Farms, Inc.*, 510 N.W.2d 41, 49 (Neb. 1994). "[T]the doctrine of collateral estoppel requires a prior final judgment; the granting or denial of a preliminary injunction is generally not based on a final decision on the merits and is not a final judgment for the purposes of collateral estoppel." *Medtronic, Inc. v. Gibbons*, 684 F.2d 565, 569 (8th Cir. 1982).

A "trade secret" is defined under the Nebraska Trade Secrets Act as "information, including, but not limited to, a drawing, formula, pattern, compilation, program, device,

method, technique, code, or process that: (a) derives independent economic value, actual or potential, from not being known to, and not being ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Neb. Rev. Stat. §§ 87-502(4).  The elements necessary to establish a cause of action for misappropriation of a trade secret are (1) the existence of a trade secret or secret manufacturing process, (2) the value and importance of the trade secret to the employer in the conduct of his business, (3) the employer's right by reason of discovery or ownership to the use and enjoyment of the secret, and (4) the communication of the secret to the employee while he was employed in a position of trust and confidence and under circumstances making it inequitable and unjust for him to disclose it to others or to use it himself to the employer's prejudice.  *Richdale Dev. Co. v. McNeil Co.*, 244 Neb. 694, 508 N.W. 2d 853 (1993).  Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as its secret; a trade secret is something known to only a few and not susceptible of general knowledge.  *Id.*  Thus, "[a] trade secret must be a particular secret of the complaining employer and not the general secrets of the trade in which the employer is engaged."  *Selection Research, Inc. v. Murman*, 433 N.W.2d 526, 532 (Neb. 1989).

Whether allegedly protected information rises to the level of a trade secret under the Trade Secrets Act is a question of fact.  *Home Pride Foods v. Johnson*, 634 N.W.2d 774, 781 (Neb. 2001).  A customer list is the type of information that may, in some industries, be treated as trade secret information under the Uniform Trade Secrets Act.  *See Home Pride Foods v. Johnson*, 634 N.W.2d 774, 781 (Neb. 2001).  However, courts are reluctant

to protect customer lists to the extent that they embody information that is readily ascertainable through public sources. *Id.*; *see also CDI Energy Servs., Inc. v. West River Pumps, Inc.*, — F.3d —, 2009 WL 1491518, *3 (8th Cir. May 29, 2009) (affirming the denial of a preliminary injunction in a trade secret misappropriation case and finding it undisputed that the plaintiff's potential customers were "a small collection of easily identifiable, locally operating" businesses about whom information "would be easily obtainable, if not already known, by relevant actors in the local [relevant industry]."); *Chambers-Dobson, Inc. v. Squier*, 472 N.W.2d 391, 401 (Neb. 1991) (finding information in a customer list is not a trade secret, but may be part of employer's goodwill, if obtained by virtue of employment).

"[O]rdinarily, an employer has no legitimate business interest in postemployment prevention of an employee's use of some general skill or training acquired while working for the employer, although such on-the-job acquisition of general knowledge, skill or facility may make the employee an effective competitor. . . ." *Id.*  The general rule is:

> Where an employee leaves his employer and goes elsewhere, he may lawfully use in his new employment knowledge gained in the old, provided only that he does not disclose secret processes or confidential information. . . .  The employee may achieve superiority in his particular department by every lawful means at hand, and then, on the rightful termination of his contract for service, use that superiority for the benefit of himself or rivals in trade of his former employer.  The knowledge, experience, and efficiency which an employee obtains in his employment do not become the property of the employer and they are not trade secrets.

*Meylan Enterprises, Inc. v. W-S Indus. Servs., Inc.*, 2004 WL 291368, *9 (Neb. Ct. App. Feb. 17, 2004) (not designated for permanent publication) (*quoting* 30 C.J.S. Employer-Employee § 123 at 194 (1992)).  Also, knowledge of industry contact people does not rise to the level of a trade secret because this type of unprotected information is readily ascertainable within a trade. *Fox Sports Net North, L.L.C. v. Minnesota Twins P'ship*, 319

F.3d 329, 336 (8th Cir. 2003) (applying Minnesota law).  Generally, an employer can protect itself against postemployment unfair competition by an employee and protect "special information about customers, both current and prospective, that an employee obtains by virtue of employment" through execution of a valid noncompetition covenant. *See Chambers-Dobson, Inc. v. Squier*, 472 N.W.2d at 401 (involving data pertinent to continuation of a customer's business and, hence, part of the company's goodwill).

Covenants not to compete must be reasonable in terms of restraint of trade principles in order to be enforceable. *Philip G. Johnson & Co. v. Salmen*, 317 N.W.2d 900, 903 (Neb. 1982).  The objective of a covenant not to compete is the prevention of an employee's competitive use of information or a relationship with a customer or client, which pertains peculiarly to the employer and has been acquired in the course of the employee's employment with the employer.  *Boisen v. Petersen Flying Serv. Inc.*, 383 N.W.2d 29, 33 (Neb. 1986).  The validity of a covenant not to compete aimed at preventing a former employee from unfairly appropriating customer goodwill depends on whether the restriction is no greater than reasonably necessary to protect an employer's legitimate interest. *Vlasin v. Len Johnson & Co.*, 455 N.W.2d 772, 776 (1990).  A noncompete agreement connected to employment will be found to be "no greater than reasonably necessary 'only if it restricts the former employee from working for or soliciting the former employer's clients or accounts with whom the former employee actually did business and ha[d] personal contact.'"  *H & R Block Tax Servs., Inc. v. Circle A Ent., Inc.*, 693 N.W.2d 548, 554 (Neb. 2005) (*quoting Polly v. Ray D. Hilderman & Co.*, 407 N.W.2d 751, 756 (Neb. 1987)).  Thus, under Nebraska law, a covenant not to compete is only valid if it restricts the former employee from soliciting or working for clients of the former employer with whom the former

employee actually had contact.  *See Mertz v. Pharmacists Mut. Ins. Co.*, 625 N.W.2d 197, 204-5 (Neb. 2001).  Nebraska courts have narrowly defined the permissible scope of covenants not to compete contained in employment agreements to include only this form of "customer specific" restraint.  *Presto-X-Co. v. Beller*, 253 Neb. 55, 64-65 (Neb. 1997). This test is applied strictly.  *H & R Block*, 693 N.W.2d at 554.

To establish a claim for tortious interference with a business relationship under Nebraska law, a plaintiff must prove:  (1) the existence of a valid business relationship or expectancy; (2) the defendant had knowledge of the relationship or expectancy; (3) the defendant committed an unjustified intentional act of interference with the relationship; (4) causation; and (5) damages.  *Macke v. Pierce*, 661 N.W.2d 313, 317 (Neb. 2003).  In order to constitute actionable interference with an employment relationship, the actions of a co-employee must be shown to have been committed in furtherance of some purpose other than the lawful purposes of the employer.  *Huff v. Swartz*, 606 N.W.2d 461, 468 (Neb. 2000).  Such interference must be "unjustified" in order to be actionable.  *Id.* (listing factors to consider in determining whether interference with a business relationship is unjustified).

### B.    Analysis

The court first finds that Nebraska law should be applied in this case.  With respect to most issues, the doctrine of "false conflict" applies, and the court need not address the issue of choice of law.  There is only a difference in the laws of two states with respect to the issue of adequate consideration to support a contract.[2]  However, the court need not address the issue of whether the confidentiality agreement was void for lack of

---

[2] Under Missouri law, continued employment can constitute consideration for a nondisclosure and nonsolicitation agreement and under Nebraska law, it may not.  *Compare Computer Sales, Int'l, Inc. v. Collins, 723 S.W.2d 450, 452 (Mo. Ct. App. 1986) with Aon Consulting, Inc. v. Midlands Fin. Benefits, Inc., 748 N.W.2d 626, 639-40 (Neb. 2008)* (finding agreement to pay severance was consideration).

consideration because, as discussed further below, the court finds that the evidence establishes that Softchoice's customer information was not a confidential trade secret covered by the agreement at issue.[3]  Accordingly, the court will apply Nebraska law.

The court finds that MacKenzie has shown that he is entitled to judgment as a matter of law.  The plaintiff cannot succeed on its claims for breach of contract, misappropriation of trade secrets or unfair competition without a showing that the information he allegedly misappropriated was a trade secret.  Importantly, MacKenzie did not sign a covenant not to compete and expressly sought assurance that he was free to contact his former customers.[4]

The evidence establishes that the information at issue in this action is not confidential and not a trade secret.  MacKenzie has produced evidence showing that the information is freely available throughout the industry.  A list of the customers that a large reseller of computer software would target in a town the size of Omaha could essentially be put together from the phone book.  There are relatively few large corporate entities in this market.  There has been no showing that these customers keep the identity of "contacts" in their purchasing departments a secret.  Customer contact information is readily available through either purchased lists or by simply asking a switchboard operator.  MacKenzie has also shown that he obtained the only information that could arguably be

---

[3]The court finds that the doctrine of collateral estoppel has no application in the circumstances of this case.  There has been no showing that the issues involved in the various cases are identical.  The other cases involved different contracts, different employees, different customer information, and application of another state's law.  Also, the other cases involved covenants not to compete as well as nondisclosure agreements.  The court notes, however, that the courts' reasoning on the trade secret and noncompetition clause issues is relevant and persuasive.  *See* Filing No. 32, Index of Evid., Ex. 10, *Softchoice, Inc. v. Schmidt,* Mem. & Op. at 5; Filing No. 33, ex. 13, *Softchoice v. Cole,* no. 08-SLC-00626, Mem. & Op. at 2 (St. Louis Co., Mo. Cir. Ct. Aug. 29, 2008).

[4]Although not necessary to the court's resolution of the issue, the court finds that Softchoice, as successor to SWP's rights and liabilities, is bound by its predecessor's representations.  The confidentiality agreement did not prohibit MacKenzie from soliciting his former customers.

categorized as "secret," that is, pricing information, from the potential customers themselves, who freely shared the information with him in hopes of obtaining a lower price. MacKenzie has also shown that his suppliers shared this sort of information.

In support of its argument, Softchoice points to MacKenzie's admissions that he contacted as many of his former customers as he could shortly after he started at En Pointe and that he asked those customers for copies of Softchoice contracts so that he could structure En Pointe's bids. That evidence, however, does not support Softchoice's trade secret claim. If anything, it weighs in favor of MacKenzie's position by showing that (1) MacKenzie did not have copies of pricing information and (2) the pricing information was not a secret. Softchoice's customers were not bound by confidentiality or nondisclosure agreements. The testimony of Softchoice executives that Softchoice regarded the information as secret does not make it so. The precautions that Softchoice took to safeguard its information—firewalls, passwords and locks—are nothing more than the ordinary precautions that any responsible corporation would take to preserve and protect its data.

The court finds that as a matter of law, Softchoice cannot show that MacKenzie's actions were illegal, improper, or unfair. Notably, MacKenzie was not bound by a nonsolicitation agreement. Softchoice, or its predecessor, could have limited MacKenzie's contact with his former customers, and consequently protected its pricing information, through a narrowly drawn, valid and enforceable covenant not to compete, but it did not do so. Softchoice cannot achieve by way of a nondisclosure agreement what it could not have obtained via a nonsolicitation agreement. Nebraska law clearly requires covenants not to compete to be narrowly tailored so as not to prohibit an employee from plying his trade and

16

thus operating as a restraint of trade. As discussed further below, the covenants not to compete that Softchoice attempts to enforce against Lawrence and other former employees are not narrowly tailored to protect Softchoice's legitimate business interests and its goodwill.

In this case, the noncompetition agreement with Lawrence is overly broad and not enforceable under Nebraska law. The agreement covers Softchoice's and its predecessor's present and potential customers and is not limited only to the customers that were contacted by Lawrence. Because the covenant not to compete is void and unenforceable, Softchoice had no legitimate expectation that Lawrence would refrain from contacting former customers. Nor does it have a legitimate expectation that Lawrence would continue to work for Softchoice, since he was an at-will employee. Similarly, Softchoice had no legitimate expectation that its relationships with customers would continue after the term of their contracts with Softchoice had ended. Accordingly, MacKenzie could not have tortiously interfered with any legitimate business relationship or expectancy between Softchoice and either its customers or its former employee, Jeffrey Lawrence. Accordingly,

IT IS ORDERED that the defendant's motion for summary judgment (Filing No. 24) is granted; this action is dismissed.

DATED this 2nd day of July, 2009.

BY THE COURT:


s/ Joseph F. Bataillon
Chief United States District Judge